IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| DELAWRENCE KING, | CASE NO. 1:06CV1226 |
| Petitioner, | |
| | JUDGE BOYKO |
| v. | |
| | MAGISTRATE JUDGE HEMANN |
| STUART HUDSON, Warden, | |
| | **REPORT AND RECOMMENDATION** |
| Respondent. | |

This matter is before the magistrate judge pursuant to Local Rule 72.2(b)(2). Before the court is Delawrence King's ("King") petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 on May 17, 2006 (Docket #1). King is in the custody of the Mansfield Correctional Institution in Mansfield, Ohio pursuant to a journal entry of sentence in *State v. King*, Case no. 03CR064084 (Lorain County 2005). For the reasons given below, the magistrate judge recommends that the court dismiss King's petition.

I.

On November 5, 2003, King was indicted on two counts of aggravated murder, two counts of murder, two counts of felonious assault, and one count of improperly discharging a firearm at or into a habitation. All counts included a gun specification. The state appellate court reviewing King's conviction described the following facts as relevant to his case:

{¶ 11} During the trial, the State presented testimony from several witnesses and Appellant testified on his own behalf. It was undisputed that on October 26, 2003, Appellant fired several gunshots that resulted in the deaths of two men. At issue

were the events leading up to the shootings.

{¶ 12} Charles A. Mason ("Mason") testified to the following for the State.  In the early evening of October 26, 2003, Mason was moving out of the Wilkes Villa housing complex when he heard his fiancé arguing with someone.  Mason discovered Appellant attempting to remove the rear exterior light of Mason's apartment.  Appellant then "pulled a pistol" on Mason; Appellant eventually settled down, put the gun away, and left.  Later, Mason and his fiancé encountered Appellant again and Appellant accused Mason of owing him money and asked Mason if he had called the police.  When Appellant was convinced that Mason had not called the police he left.  Mason and his fiancé began to walk towards their car and Mason heard gunshots coming from the vicinity of Appellant.  Mason identified a red coat with fur as being Appellant's coat, but stated that Appellant was not wearing it when he saw him that evening.

{¶ 13} On cross-examination Mason denied buying drugs from Appellant.

{¶ 14} Darrine T. Miles ("Miles") testified to the following for the State.  Miles also lived in Wilkes Villa, was friends with Appellant, and saw Appellant on October 26, 2003.  Miles and Appellant drank beer and talked during the day and met up again that evening.  That evening Appellant told Miles that he had fired a gun earlier in the day and attempted to take a light bulb.  Miles and Appellant went to Appellant's sister's house for an hour to an hour and a half and then, at Appellant's direction, they left and walked to Tedman Court, another area in Wilkes Villa.  Miles knew that Appellant had his gun in his waistband. Appellant told Miles they were going to get gas money, but Miles had no idea where they were going to get it from.

{¶ 15} Miles continued testifying to the following.  When they arrived at Tedman Court they encountered a group of people.  Miles knew them by name and/or street name; the group included "Michi"/Demetruis, Roy Killings ("Killings"), Darius Corlew ("Corlew"); and "New York"/Tyrone Francis ("Francis").  Everyone talked for about 15 minutes and Corlew stated that he felt threatened because Appellant was standing by him with a gun; Appellant told Corlew he was not threatening him.  No one else in the group had a gun.  An argument ensued and Appellant pulled out the gun and cocked it.  After cocking the gun, Appellant told Corlew that now he was threatening him and when Corlew started walking towards Francis' apartment screen door Appellant fired the gun.  Appellant pointed the gun directly at Corlew and fired, with only two to three feet in between them.  Once Appellant started firing everyone ran.  Appellant fired the gun until it was empty.  Miles and Appellant then fled the scene and ran to Miles' aunt's house.  Miles did not see Appellant's gun after they arrived at his aunt's apartment. While running Miles and Appellant threw their coats off.  When they arrived at Miles' aunt's apartment they encountered a family friend, asked for a ride out of the area, and a neighbor gave them a ride to Lorain.  During the ride, Appellant's pager went off and he used the neighbor's cell phone.  The neighbor dropped Appellant off at a family member's house and then

dropped Miles off at his mother's house. Miles told his mother what had happened and spoke with his father, who informed Miles that the police were looking for him and he needed to turn himself in. Miles then went to the Elyria Police Station.

{¶ 16} Miles testified to the following on cross-examination. Miles had several conversations with the police about what happened on October 26, 2003 and they questioned the accuracy of some of his statements. Wilkes Villa is a high drug and crime area. Miles denied that Appellant's coat was the "dope coat," which is the coat the dope dealer wears. About two or three weeks prior to the shooting Appellant was robbed at gun point in Wilkes Villa. Appellant was not wanted around Wilkes Villa. Miles denied disposing of Appellant's gun after the shooting, but he did admit firing into the air prior to the shooting. Prior to the argument between Corlew and Appellant, Francis went into his apartment; Corlew had opened the door to enter the apartment when Appellant began firing. When he spoke with the police, Miles told them Appellant either shot Corlew because he was drunk or scared that Corlew was going to get a gun.

{¶ 17} Miles testified on re-direct examination that he did not fire the gun by Mason's apartment and that Corlew had his back to Appellant when Appellant shot him.

{¶ 18} Jamie Leticia Williams ("Williams"), a seventh grader, testified to the following for the State. She witnessed the shooting at Ledman Court and identified Appellant as the shooter. She saw Appellant talking with someone, pull a gun, and start shooting.

{¶ 19} On cross-examination Williams testified that she saw two people with guns and only Appellant fired a gun.

{¶ 20} Demetrius Martel Tarrant ("Tarrant") testified to the following for the State. He was present on Tedman Court when Corlew and Francis were shot. He saw Appellant and Miles approaching and noticed Appellant loading and cocking a gun and then "put [the gun] in his pants." Corlew told Appellant he felt threatened by him having a gun and Appellant told him he wasn't threatening him, but Corlew still felt threatened. Appellant said if he pulled out the gun he was going to use it. Corlew told him to go somewhere else with the gun. Tarrant then saw Appellant pull the gun out and fire. No one else had a gun that night. The shooting occurred as Corlew was going into the apartment and Francis was coming out; both men were shot.

{¶ 21} Tarrant testified to the following on cross-examination. Appellant was the only person with a gun. There was tension between Appellant and Corlew. Tarrant denied Killings ditched a gun as they ran from the shooting.

{¶ 22} On re-direct examination, Tarrant testified that when Appellant approached the group that night, Corlew told him that he had already seen Appellant that

evening and yelled at him for shooting at the clouds.

{¶ 23} Dr. Matus, the Lorain County Coroner, performed the autopsies on Corlew and Francis and testified to the following. Francis died from a single gunshot wound and Corlew was shot four times and died as a result of his injuries

{¶ 24} Detective Scott L. Willis of the Elyria Police Department ("EPD") testified to the following.  Six shell casings were located outside Corlew's apartment.  He recovered a red jacket about a half mile from the crime and it tested positive for gunshot residue.  He also identified a red leather jacket that Miles had turned into the police.  No gunshot residue was found on the hands of Corlew or Francis.

{¶ 25} Killings testified to the following for the State.  At the time of the shooting he was living in Wilkes Villa.  When Appellant approached the group outside Francis' apartment, Corlew told Appellant to put the gun away or leave. Appellant then pulled the gun out and Corlew again told him to go away and attempted to enter the apartment.  Appellant began firing and Corlew was shot as he attempted to enter the apartment and Francis was shot as he attempted to exit the apartment.  Right before Appellant started shooting he told Corlew "Lay your bitch ass down."  No one else had a gun that night.

{¶ 26} On cross-examination, Killings testified to the following.  He did not speak to the police the night of the shooting because he ran from the shootings.  Killings admitted that he was currently being held in Juvenile Detention for drug trafficking.  A couple weeks before the shootings, in an attempt to rob one of Killings' friends, Appellant hit Killings' friend with a beer bottle.  In response, Killings, that friend, and another friend found Appellant and beat him up.  One of Killings' friends stole Appellant's pager, but Killings gave it back to him. Killings denied stealing Appellant's drugs a couple days before the shootings.  About 20 minutes before the shootings, Corlew told Killings that if Appellant came up with a gun, he was going to "rush him."  When Appellant and Miles approached about 10-11 males were outside Francis' apartment.  Appellant said something about shooting Corlew.  Killings denied having a gun that night and denied pointing it at Appellant.

{¶ 27} Killings testified on re-direct examination that Corlew and Francis were not involved in the incident where Appellant was beaten up and his pager was stolen.

{¶ 28} Jerrod Jackson ("Jackson") testified to the following for the State.  He was currently incarcerated for assaulting a police officer and intimidation. Jackson was present during the shootings and he saw Appellant approach the group outside Francis' apartment and pull out a gun and start shooting.  Appellant then ran right past him and Miles ran after him; at one point Appellant turned around and "was about to fire at [Miles]" until Miles said "It's me, it's me."  The two continued to run away from the scene and Jackson went to the apartment and saw Corlew on the ground.  Jackson remained on the scene until the police told him to leave.

4

{¶ 29} Jackson testified on cross-examination that he spoke to a police officer the night of the shootings and that he had been with the group prior to the shooting and was returning to the group when the shootings occurred.

{¶ 30} Sade Charlton ("Charlton") testified to the following for the State.  She was Appellant's girlfriend for a couple of months in 2003.  After she heard about the shootings, she paged Appellant because she did not believe that he shot Corlew and Francis.  Appellant called Charlton back and she asked him if he shot two people and he said no.  Then she asked him if he fought with two people and he answered yes.  When asked why she used the term "fight" in the conversation, Charlton explained that Appellant thought the phones were being tapped, so instead of using the word "shoot" she used the word "fight."

{¶ 31} Charlton testified on cross-examination that during her conversation with Appellant the night of the shootings he said:  "That n[ ] was coming at me crazy, and that's why I shot him."

{¶ 32} On re-direct, Charlton testified that Appellant actually said:  "That n [ ] was talking crazy, so I did what I had to do."  During the investigation, Charlton told the police Appellant told her he shot Corlew because he was talking crazy.  Charlton confirmed her prior statement to the police three times during redirect examination.

{¶ 33} After the State's exhibits were admitted into evidence, Appellant made a Crim.R. 29 motion regarding all counts in the indictment.  The trial court granted Appellant's motion on count two, the aggravated murder charge for the death of Francis, and denied the motion as to the other counts.

{¶ 34} Appellant testified on his own behalf to the following.  Appellant grew up in the Lorain-Elyria area, but had been incarcerated in Nebraska prior to the shooting.  He had moved back to the Wilkes Villa area around August 2003 and started selling crack cocaine.  Appellant knew Corlew from before he went to Nebraska, but upon his return he had not had any direct dealings with Corlew until the shootings. Appellant began having trouble with other drug dealers in the neighborhood who were upset he was taking their clientele.  He testified to the two incidents Killings described.  When discussing one of the incidents, Appellant used the term "Lay your bitch ass down."  During the incident when Appellant's pager was stolen, Killings' friend pointed a gun at Appellant and ordered Appellant to empty his pockets; the man also threatened to kill Appellant if he was ever in the neighborhood again. Killings later returned Appellant's pager and told him that the man who had stolen it was arrested and accused Appellant of being a "snitch."

{¶ 35} Appellant continued his testimony, testifying to the following.  A couple of days before the Wilkes Villa shootings, he was selling drugs at a gas station and a group of masked men approached him.  He recognized Killings' voice and Demetrius' height, but he could not see any faces.  The group brandished guns and

5

told Appellant to give them "all of his shit." They took Appellant's drugs and told him that he did not deserve to be out there. After the gas station incident, Appellant bought a gun to "[p]rotect [himself]."

{¶ 36} Appellant testified to the following regarding the shootings. During the late afternoon, he and Miles were hanging out, drinking and shooting his gun. Appellant needed to visit a friend about a potential job, so the two decided to walk to Appellant's friend's house. Appellant was wearing his red jacket, previously identified as the one police found on the ground, and had his gun "tucked away" in his pants. Miles was wearing his red leather jacket. While walking, the two came upon a group of males and Appellant recognized Killings, Corlew, and Demetrius. Appellant shook hands with the males, except when he went to shake Corlew's hand Corlew just "stood there." Corlew then "jumped" in Appellant's face saying: "You think you're hard with that gun, you bitch ass n[ ], you ain't hard." Then the group started spreading out, "surrounding" Appellant and he felt it was time to leave. Corlew was about one to two feet away from Appellant when he was yelling at him. Prior to Corlew yelling at him, Appellant informed Corlew that he had a gun. Appellant attempted to walk away and Corlew cut him off saying: "I feel threatened because you standing right here. You know what I do to mother[ ]? I should kill your bitch ass, you're a bitch, you're a bitch." Appellant responded: "Man, I ain't threaten you, I ain't threaten you, I ain't threaten you." Corlew "started pulling for his gun" and Appellant pulled out his and fired as he ran away. He saw Killings had his gun drawn, but it did not fire. Appellant did not see Corlew with a gun, but he "knew he had one." Appellant felt "scared" when Corlew confronted him. He shot his gun because Corlew "was about to kill [him]." When he was running away he turned around and noticed someone running behind him, Miles identified himself and the two continued running. Appellant threw off his coat because he didn't want to be spotted by the group of males. Miles told Appellant to give him the gun, which he did, and Miles threw it. Appellant and Miles got a ride to Lorain. Appellant visited his grandmother and learned that he had shot two people. His grandmother told him to turn himself in to the police and he did.

{¶ 37} Appellant testified to the following on cross-examination. Appellant admitted that selling drugs and buying and carrying a gun violated the laws of Ohio and his parole conditions from Nebraska. He admitted arming himself with the gun and test firing it to ensure that it worked properly. Appellant carried the gun for about two to three days before shooting Corlew and Francis. He denied trying to steal Mason's light bulb and firing the gun after attempting to steal the light bulb. Appellant had never had any problems with Mason. Appellant was a couple of feet away from Corlew when Appellant fired the first shot and he continued to shoot as he ran away. Appellant fired the gun with his left hand and as he ran he moved his left arm under his right underarm, across his body, and continued firing, not looking where he was shooting, but hitting his target several times. Appellant admitted that when he fired the first shot at Corlew, Corlew did not have a weapon in his hands. Appellant chose to approach Corlew and the other males even though he had recent run-ins

6

with some of the males in the group.

{¶ 38} Appellant testified on re-direct examination that he fired the gun because he feared for his life.

*State v. King*, 2005 WL 1962967, *2-*7 (Ohio App. Aug. 17, 2005). On September 23, 2004, King was found guilty of counts of murder counts and one count of felonious assault, all counts with gun specifications.

On October 12, 2004 King timely filed a notice of appeal of his conviction and sentence in the state appellate court. In his appeal King raised four assignments of error:

> ASSIGNMENT OF ERROR NUMBER ONE:
> APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE
>
> ASSIGNMENT OF ERROR NUMBER TWO:
> THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29 OF THE OHIO RULES OF CRIMINAL PROCEDURE
>
> ASSIGNMENT OF ERROR NUMBER THREE:
> THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED APPELLANT'S MOTION FOR A CHANGE OF VENUE
>
> ASSIGNMENT OF ERROR NUMBER FOUR:
> APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

The appellate court overruled King's four assignments of error and affirmed his conviction on August 17, 2005.

King timely filed a notice of appeal of the appellate court decision in the Ohio Supreme Court on October 3, 2005. King asserted the following propositions of law in his memorandum in support of jurisdiction:

> Proposition of Law No. I: Appellant's conviction was against the manifest weight of the evidence.

> Proposition of Law No. II:  The trial court erred by denying Appellant's motion for judgment of acquittal pursuant to Rule 29 of the Ohio Rules of Criminal Procedure.
>
> Proposition of Law No. III:  The trial court abused its discretion by denying Appellant's motion to change venue.
>
> Proposition of Law No. IV:  Appellant was denied his right to effective assistance of counsel.

On December 28, 2005, the Ohio Supreme Court denied King leave to appeal and dismissed his appeal as not involving any substantial constitutional question.

King timely filed a petition for a federal writ of habeas corpus on May 17, 2006, raising four grounds for relief:

> Ground One:  Petitioner's conviction was against the manifest weight of the evidence.
>
> Ground Two:  The trial court erred by denying Petitioner's motion for judgment of acquittal pursuant to Rule 29 of the Ohio Rules of Criminal Procedure.
>
> Ground Three:  The trial court abused its discretion by denying Petitioner's motion to change venue.
>
> Ground Four: Petitioner was denied his right to effective assistance of counsel.

Respondent filed an answer on September 12, 2006  (Docket #8).  Thus, the petition is ready for decision.

II.

*A. Jurisdiction*

King is in the custody of the Mansfield Correctional Institution in Mansfield, Ohio and was sentenced by the Court of Common Pleas in Lorain County, Ohio.  King filed his writ of habeas corpus in the Northern District of Ohio and raises claims regarding the constitutionality of his incarceration pursuant to 28 U.S.C. § 2254:

> Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions . . . Where

> an application for a writ of habeas corpus is made by a person in custody under the judgment and sentence of a State court of a State which contains two or more Federal judicial districts, the application may be filed in the district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him and each of such district courts shall have concurrent jurisdiction to entertain the application.

28 U.S.C. § 2241(a) and (d). This court has jurisdiction over King's claims.

B. *Evidentiary Hearing*

The habeas corpus statute authorizes an evidentiary hearing in limited circumstances when the factual basis of a claim has not been adequately developed in state court proceedings. 28 U.S.C. § 2254(e)(2). There is no need for an evidentiary hearing in the instant case. All of King's claims involve legal issues which can be independently resolved without additional factual inquiry.

C. *Exhaustion of state remedies*

Prior to seeking review of conviction by federal habeas corpus, a state prisoner must exhaust all possible state remedies or have no remaining state remedies. 28 U.S.C. § 2254(b) and (c); *Castille v. Peoples*, 489 U.S. 346, 349 (1989); *Riggins v. McMackin*, 935 F.2d 790, 793 (6th Cir. 1991). The prisoner must fairly present any claims to the state in a constitutional context. *Anderson v. Harless*, 459 U.S. 4 (1982); *Picard v. Connor*, 404 U.S. 270 (1971); *Shoultes v. Laidlaw*, 886 F.2d 114, 117 (6th Cir. 1989). The exhaustion requirement is satisfied when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on all of the petitioner's claims. *Manning v. Alexander*, 912 F.2d 878, 881-83 (6th Cir. 1990).

Because King has no remaining state remedies, he has exhausted his claims.

D. *Procedural Default*

Procedural default occurs when a petitioner fails to present fairly his or her constitutional claims to the highest state court in a federal constitutional context. *Anderson*, 459 U.S. 4; *Picard*, 404 U.S. 270. Reasons of federalism and comity generally bar federal habeas corpus review of "contentions of federal law . . . not resolved on the merits in the state proceeding due to respondent's failure to raise them as required by state procedure." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). When a petitioner

> has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Respondent does not contend that King has procedurally defaulted any of his claims. As procedural default is a defense which respondent must raise, the court will not consider the issue of procedural default.

III

The Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA") altered the standard of review that a federal court must apply when deciding whether to grant a writ of habeas corpus. As amended, 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claims that was adjudicated on the merits in State court proceedings unless the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under the current deferential standard of review, a writ of habeas corpus may issue only

if the state court's decision is contrary to clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence. *Williams v. Taylor*, 529 U.S. 362, 379-390 (2000); *Miller v. Francis*, 269 F.3d 609, 613-614 (6th Cir. 2001). Law is "clearly established" only by holdings of the Supreme Court, not its dicta, and the law must be clearly established at the time of the petitioner's conviction. *Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

"[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The petitioner, however, may rebut "the presumption of correctness by clear and convincing evidence." *Id.* The magistrate judge will consider King's claims under the deferential standard of review accorded the state court's determinations.

A.  *Ground one:  Appellant's conviction was against the manifest weight of the evidence*

King alleges that his right to a fair trial was violated where his conviction was obtained against the manifest weight of the evidence. Specifically, King claims that the jury lost its way in convicting him because he met his burden of proof on his claim of self-defense. Respondent argues that this claim is non-cognizable in federal habeas and should be dismissed.

The due process clause of the Fourteenth Amendment requires that a criminal conviction be based upon proof beyond a reasonable doubt as to every fact necessary to constitute the offense charged. *In re Winship*, 397 U.S. 358, 363-64 (1970). The test of whether a conviction is supported by sufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have

11

found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  A habeas court resolves all conflicting inferences in favor of the prosecution, and does not weigh the credibility of witnesses.  *Walker v. Engle*, 703 F.2d 959, 969 (6th Cir. 1983).  The evidence need not be sufficient to convince the habeas court of the petitioner's guilt beyond a reasonable doubt.  *Fuller v. Anderson*, 662 F.2d 420, 435 (6th Cir. 1981).  Any conviction based upon evidence sufficient to convince any rational trier of fact of the essential elements of the crime without a reasonable doubt offends the due process clause and may serve as grounds for habeas relief.

A claim that a conviction is against the manifest weight of the evidence differs from a claim that a conviction was based on insufficient evidence:

> With respect to sufficiency of the evidence, "'sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law."  Black's Law Dictionary (6 Ed.1990) 1433.  See, also, Crim. R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction).  In essence, sufficiency is a test of adequacy.  Whether the evidence is legally sufficient to sustain a verdict is a question of law.  *State v. Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148.  In addition, a conviction based on legally insufficient evidence constitutes a denial of due process.  *Tibbs v. Florida* (1982), 457 U.S. 31, 45, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.
>
> Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence.  *Robinson, supra,* 162 Ohio St. at 487, 55 O.O. at 388-389, 124 N.E.2d at 149.  Weight of the evidence concerns "the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other.  It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them.  Weight is not a question of mathematics, but depends on its *effect in inducing belief*."  (Emphasis added.)  Black's, *supra,* at 1594.

12

> When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. *Tibbs,* 457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661.  See, also, *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.").

*State of Ohio v. Thompkins*, 78 Ohio St. 3d 380, 387-88, 678 N.E.2d 541, 546-47 (1997).

*See also Tibbs v. Florida*, 457 U.S. 31, 37-38, 38 n.11 (1982); *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).

A federal court reviewing a petition for a writ of habeas corpus has no authority to re-weigh the credibility of witnesses at trial. *Marshall v. Lonberger*, 459 U.S. 422 (1983). It is incapable, therefore, of determining whether a conviction was against the manifest weight of the evidence.  It may only determine whether a conviction was based on *sufficient* evidence. King's claim that his conviction was against the manifest weight of the evidence, therefore, is not cognizable in federal habeas corpus.  For this reason the magistrate judge recommends that the court dismiss this claim as outside the court's jurisdiction.

B.  Ground two:  The trial court violated King's right to a fair trial by denying King's motion for acquittal pursuant to Rule 29 of the Ohio Rules of Criminal Procedure

King alleges that his constitutional right to a fair trial was violated when the trial court denied his motion for acquittal due to insufficient evidence in support of his conviction. Specifically, King argues that there was no evidence presented supporting the *mens rea* required for a conviction on the second count of murder.  Respondent argues

13

that the elements of the offense were demonstrated by sufficient evidence and that the state court adjudication was not an objectively unreasonable application of federal law.

As already noted, the due process clause of the Fourteenth Amendment requires that every conviction be based upon proof beyond a reasonable doubt as to every fact necessary to constitute the offense.  *In re Winship*, 397 U.S. at 363-64.  A conviction satisfies this requirement if, after resolving all doubts in favor of the prosecution, a rational trier of fact could have found all elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319.  A habeas court may not weigh the credibility of witnesses. *Walker* , 703 F.2d at, 969.

On direct appeal, the state appellate court determined that there was sufficient evidence to find that King had purposely caused the deaths of the two victims:

> {¶ 40} After careful review of the entire record, weighing the evidence and all reasonable inferences and considering the credibility of the witnesses, this Court cannot conclude that the trial court clearly lost its way when it found Appellant guilty of murder and felonious assault.  The trial court was in the best position to evaluate the credibility of witnesses and give proper weight to their testimony.  See *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus. Appellant's conviction was not against the manifest weight of the evidence simply because the jury chose to believe the testimony of the State's witnesses.  *State v. Gilliam* (Aug. 12, 1998), 9th Dist. No. 97CA006757, at 4. Moreover, "in reaching its verdict, the jury is free to believe all, part, or none of the testimony of each witness."  *Prince v. Jordan*, 9th Dist. No. 04CA008423, 2004-Ohio-7184, at ¶ 35, citing *State v. Jackson* (1993), 86 Ohio App.3d 29, 33, 619 N.E.2d 1135.  As the factfinder, the jury was entitled to reconcile any differences and inconsistencies in the testimony and determine that the manifest weight of the evidence supported a finding of guilt. See *DeHass*, supra.
>
> {¶ 41} Based on the foregoing, this Court cannot find that Appellant's convictions were against the manifest weight of the evidence.  Furthermore, as previously stated, "a determination that [a] conviction is supported by the weight of the evidence [is] also * * * dispositive of the issue of sufficiency."  Roberts, supra at 4. Accordingly, having found that Appellant's convictions were not against the manifest weight of the evidence, this Court need not discuss further his challenge to the sufficiency of the evidence.  Thus, we find that the trial court did not err when

it denied Appellant's motion for acquittal. Appellant's first and second assignments of error lack merit.

*State v. King*, 2005 WL 1962967 at *7.

King has not demonstrated by clear and convincing evidence that the state appellate court erred in determining that sufficient evidence supported his conviction. King has also failed to show that the state court's determination was an unreasonable application of a holding of the Supreme Court or was contrary to a holding of the Supreme Court. For these reasons, the magistrate judge recommends that the court overrule King's second ground for relief.

C.     *Ground three: The trial court abused its discretion by denying King's motion to change venue*

King alleges that he was deprived of his constitutional right to a fair and impartial jury when the trial court abused its discretion by failing to grant his motion for change of venue due to media coverage of the trial proceedings. Respondent argues that King fails to demonstrate a constitutional violation because he produces no evidence to show prejudice.

The Sixth Circuit has established the following standard of review for claims alleging a violation of the right to an impartial jury due to pre-trial publicity:

> The Supreme Court differentiates between two types of jury prejudice: (1) presumed prejudice, whereby the setting of the trial is inherently prejudicial, and (2) actual prejudice, whereby voir dire is inadequate to offset extensive and biased media coverage. *See Ritchie v. Rogers*, 313 F.3d 948, 952 (6th Cir.2002) (citing *Murphy v. Florida*, 421 U.S. 794, 798, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975)), *cert. denied*, 540 U.S. 842, 124 S.Ct. 110, 157 L.Ed.2d 76 (2003). *See also Nevers v. Killinger*, 169 F.3d 352, 362 (6th Cir.1999), *cert. denied*, 527 U.S. 1004, 119 S.Ct. 2340, 144 L.Ed.2d 237 (1999), abrogated on other grounds by *Harris v. Stovall*, 212 F.3d 940 (6th Cir.2000).

   1. Presumed Prejudice

>A court presumes prejudice only in the face of a "trial atmosphere utterly corrupted by press coverage," see *Ritchie*, 313 F.3d at 952 (quoting *Dobbert v. Florida*, 432 U.S. 282, 303, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977)), or a "wave of public passion that would make a fair trial unlikely by the jury," see *id.* at 953 (quoting *Patton v. Yount*, 467 U.S. 1025, 1040, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)).  *See also Murphy*, 421 U.S. at 799, 95 S.Ct. 2031 (courts presume prejudice only where proceedings are "entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of the mob"); *see also id.* (referring to "circus like atmosphere" in Supreme Court's presumed prejudice cases and "a courthouse given over to the public appetite for a carnival"). \*\*\*\*
>
>2. Actual Prejudice
>We have said that:  When the motion for a change of venue based on extensive pretrial publicity and predicated on "presumed prejudice" fails, the issue of "actual prejudice" remains for review by the trial court to determine whether a review of both the jury voir dire testimony and the extent and nature of the media coverage indicates a fair trial is or is not possible.  *Ritchie*, 313 F.3d at 956. \*\*\*\*
>
>The question before us is accordingly whether, in light of the pretrial publicity and the court's refusal to order a change of venue, the court took adequate steps to empanel an impartial jury.  "Qualified jurors need not . . . be totally ignorant of the facts and issues involved." *Murphy*, 421 U.S. at 799-800, 95 S.Ct. 2031.  Rather, a court must look to the "totality of circumstances" to determine whether there has been actual prejudice. *Id.* at 799, 95 S.Ct. 2031.

*Robinson v. Gundy*, 174 Fed. Appx. 886, 2006 U.S. App. LEXIS 7941 (6th Cir. March 30, 2006).

>On direct appeal, the state appellate court found the following:
>
>{¶ 44} During the pre-trial process, Appellant filed a motion for a change of venue. Appellant alleged that the media had tainted the potential jury pool by releasing stories with prejudicial information and distorted facts. On May 18, 2004, a hearing was held on the motion and Appellant requested that the motion be held in abeyance until voir dire.  The trial court denied the request to hold the motion in abeyance and informed Appellant that he could renew his motion for change of venue during jury selection. The trial court found Appellant's motion premature and overruled it.  Appellant did not renew his motion before, during, or after voir dire.
>
>{¶ 45} A review of the hearing reveals that no evidence was presented to show that a fair and impartial trial could not be held in Lorain County.  Appellant failed to present any evidence of prejudicial pre-trial publicity or demonstrate that one or more of the jurors were actually biased.  Accordingly, we find that the trial court did

not abuse its discretion in denying Appellant's motion for a change of venue. Appellant's third assignment of error lacks merit.

*State v. King*, 2005 WL 1962967 at *8.

King has not demonstrated by clear and convincing evidence that the state appellate court erred in determining that King failed to produce evidence to show prejudice or to support his contention that a fair and impartial trial could not be held in Lorain County. King has also failed to show that the state court's determination was an unreasonable application of a holding of the Supreme Court or was contrary to a holding of the Supreme Court. For these reasons, the magistrate judge recommends that the court overrule King's third ground for relief.

D.  *Ground four: Petitioner was denied his right to effective assistance of counsel*

King alleges that he was deprived of his constitutional right to effective assistance of counsel. Specifically, King claims that trial counsel failed to investigate, call, or secure the appearance of witnesses other than the petitioner and failed to present evidence regarding petitioner's theory of self-defense. Respondent argues that because trial counsel adopted reasonable trial tactics in not calling additional witnesses, counsel's performance was not ineffective.

The standard for determining whether petitioner's counsel was ineffective is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Groseclose v. Bell*, 130 F.3d 1161, 1167 (6th Cir. 1997). A claim of ineffective assistance of counsel has two components:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not

> functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687; *see also Groseclose*, 130 F.3d at 1167.

The first prong of this test, the showing of deficient performance, is an objective one: "[T]he proper standard for attorney performance is that of reasonably effective assistance. . . . When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness," as judged by "prevailing professional norms." *Strickland*, 466 U.S. 687-88; *see also Groseclose*, 130 F.3d at 1167. Scrutiny of counsel's performance is highly deferential to avoid second-guessing an adverse decision. *Strickland*, 466 U.S. at 689; *see also Groseclose*, 130 F.3d at 1167. The petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Groseclose*, 130 F.3d at 1167. A court reviewing counsel's performance "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." *Id.* at 690-91 (1984); *see also Groseclose*, 130 F.3d at 1167-6.

The second prong of the test for ineffective assistance of counsel is whether the error prejudiced petitioner:

18

> An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution.

*Strickland*, 466 U.S. at 690-91 (citations omitted); *see also Groseclose*, 130 F.3d at 1168. Further "the burden rests on the accused to demonstrate a constitutional violation." *United States v. Cronic*, 466 U.S. 648, 658 (1984). Showing a constitutional violation requires showing that "counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Nix v. Whiteside*, 475 U.S. 157, 175 (1986). A reviewing court must ask itself "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695; *see also Groseclose*, 130 F.3d at 1168.

In reviewing the trial records, the state appellate court found the following regarding this claim for relief:

> {¶ 50} After reviewing the record and Appellant's brief, we find that Appellant has not provided sufficient evidence to contradict that his trial counsel's performance was adequate and that counsel's action, as well as inaction, was sound trial strategy under the circumstances of the case. Moreover, we will not second-guess Appellant's trial counsel's decision not to call additional witnesses. The record reveals that Appellant's counsel listed six individuals in discovery responses as potential witnesses for Appellant. Such evidence shows that Appellant's counsel was aware of potential witnesses and made a decision not to call them as witnesses. Appellant has not alleged that any of the witnesses that he argues should have been called were present during the shooting; he only claims that they "lived in close proximity" to the people involved. Moreover, one of the witnesses Appellant listed as a potential witness on his behalf, Charles Mason, was called by the State and cross-examined by the defense. Appellant has provided no evidence that his counsel failed to call a witness that would have supported his self-defense claim.

{¶ 51} Based on the foregoing, this Court finds that Appellant has not demonstrated that a failure to call additional witnesses was deficient lawyering or anything other than a sound trial strategy. We further find that Appellant has not demonstrated that the outcome of the trial would have been different had additional witnesses testified on his behalf. Appellant's fourth assignment of error is without merit.

*State v. King*, 2005 WL 1962967 at *9 - *10.

King does not demonstrate by clear and convincing evidence that the state appellate court erred in determining that counsel's decision not to call other witnesses was sound trial strategy and that King was not prejudiced by the alleged error. King has also failed to show that the state court's determinations were unreasonable applications of holdings of the Supreme Court or were contrary to holdings of the Supreme Court. For these reasons, the magistrate judge recommends that the court overrule King's fourth ground for relief.

IV.

For the foregoing reasons the magistrate judge recommends that the court dismiss King's petition for a federal writ of habeas corpus.


Date:  December 15, 2006            /s/Patricia A. Hemann
                                    Patricia A. Hemann
                                    United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 )1985), *reh'g denied*, 474 U.S. 1111 (1986).